UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: | CASE NO.   10-24375 |
| RICHARD P. MARRERO, and DONNA M. MARRERO, | CHAPTER   13 |
| DEBTORS | Re: ECF No. 23 |

APPEARANCES:

William A. Hamzy, Esq.                    Attorney for Debtors
The Hamzy Law Firm LLC
140 Farmington Avenue
Bristol, CT 06010

Robert J. Piscitelli, Esq.                Attorney for Eastern Savings Bank, FSB
Law Offices of Robert M. Meyers LLC
56 East Main Street, Suite 1
P.O. Box 805
Avon, CT 06001-0805

**MEMORANDUM OF DECISION ON OBJECTION TO CONFIRMATION OF DEBTORS' CHAPTER 13 PLAN**

ALBERT S. DABROWSKI, United States Bankruptcy Judge

**I. INTRODUCTION**

In the present matter, Eastern Savings Bank, FSB, (hereinafter, "Eastern"), a secured creditor of the Debtors, has objected to the confirmation of the Debtors' First Amended Plan, (hereafter, the "Plan") asserting that the Plan is not feasible and fails to provide interest on its secured claim at a rate that will allow it to receive property of a total

value equal to the allowed amount of its claim. As more fully discussed hereafter, because the Plan is both feasible and the Plan's interest rate is adequate to fully compensate Eastern in accordance with the Bankruptcy Code, Eastern's objection shall be overruled.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. §1334(b). This court derives its authority to hear and determine the instant matter on reference from the District Court pursuant to 28 U.S.C. §§157(a), (b)(1) and the District Court's General Order of reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §157(b)(2)(L).

## III. FACTUAL AND PROCEDURAL BACKGROUND

The following relevant and undisputed facts are adduced either from the schedules and statements on file, facts verbally stipulated to by counsel at a court hearing held on August 9, 2011 (hereafter, the "Hearing"), and certain testimony by Anthony Trainer, a witness called by Eastern at the Hearing.

On December 29, 2010, the Debtors, Richard and Donna Marrero commenced the present bankruptcy case by the filing of a voluntary petition under Chapter 13 of Title 11 of the United States Bankruptcy Code. The Debtors' previously completed another Chapter 13 case, receiving a discharge in 2008.[1] According to the Debtors' *First Amended Schedule I - Current Income of Individual Debtor(s)* and *First Amended Schedule J - Current Expenditures of Individual Debtor(s)*, ECF No. 27, filed June 30, 2011, and

---

[1] Case No. 03-20289, filed January 31, 2003, *Order Confirming Chapter 13 Plan* entered October 8, 2003, *Discharge of Debtor[s] After Completion of Chapter 13 Plan* entered February 1, 2008, Bankruptcy Case closed March 4, 2008.

2

undisputed by Eastern, each Debtor is currently employed as a nurse with a combined monthly income after payroll deductions of $9,883.39, and have current monthly expenses of $2,862.00, leaving them with a monthly net income of $7,021.39.

Under consideration now is an *Amended Objection to Plan Confirmation* (hereafter, the "Objection"), ECF No. 23, filed by Eastern in connection with the Debtors' *First Amended Chapter 13 Plan* (hereinafter, "the Plan"), ECF No. 22, filed March 9, 2011.[2] Through the Plan the Debtors propose, *inter alia*, to retain their Property and pay to Eastern the balance of a note secured by the Debtors' home at 307 East Road, Bristol, Connecticut (heretofore and hereafter, the "Property") over a period of 60 months. Because the loan matured on January 1, 2005, in accordance with a loan modification agreement entered into by the parties in 1999, the parties are in agreement that Bankruptcy Code §§1322(c)(2) and 1325(a)(5) permit the payment of Eastern's secured debt *in full* over the life of the Plan. The Debtors' schedules indicate that the fair market value of the Property is $152,000.00,[3] and Eastern has filed a proof of claim indicating that its secured debt is $190,825.06. The Plan provides monthly payments of $4,502.38, the bulk of which amounts will, following confirmation, be paid to Eastern, after payment of approximately $11,000.00 in priority taxes to the Internal Revenue Service and $5,000.00 in professional fees to the Debtors' attorney and the Chapter 13 trustee.

---

[2] The Debtors' filed their original *Chapter 13 Plan* with the Petition. ECF No. 8. After the filing of the Objection, the Debtors filed a *Second Amended Chapter 13 Plan*, ECF No. 26. Plan payments provided for in the Second Amended Plan are approximately $23.00 a month higher than the Plan; an amount which does not alter the result herein.

[3] In the *Post-Hearing Brief of Eastern Savings Bank, FSB,* ECF No. 29, filed August 23, 2011, Eastern represented that this value was also established in the foreclosure action commenced by Eastern in state court.

3

## IV. DISCUSSION

Eastern's is a two-part objection. First, Eastern argues that the interest rate the debtors' propose to pay over the 60-month term of the Plan is inadequate in that the property to be distributed to it over the life of the Plan will not have a total "value, as of the effective date of the plan" at least equal to the value of the creditor's secured claim. Bankruptcy Code §1325(a)(5)(B)(ii) provides in relevant part,

> (a) Except as provided in subsection (b), the court shall confirm a plan if -
> ...
>     (5) with respect to each allowed secured claim provided for by the plan-
> ...
>         (B)(i) the plan provides that-
> ...
>         (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of the claim....

The second part of Eastern's objection is its allegation that the Plan is not "feasible." More precisely, Bankruptcy Code §1325(a)(6) requires as a condition of confirmation, that "the debtor will be able to make all payments under the plan and comply with the plan". Since whether the debtors will be able to make all payments under the Plan stems in part on what interest rate they are required to pay on Eastern's secured claim, it is appropriate for the court to first consider what is the appropriate interest rate applicable in this case and momentarily defer the consideration of feasiblity, except to the extent feasibity is a factor to be considered in the determination of the rate.

### *A. The Interest Rate*

In memoranda filed with the court, both counsel for the Debtors and Eastern

directed the Court's attention to the case of *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004) as the relevant, controlling, authority in this case. However, in the view of the Court, *Till* only partially resolves the issue. In *Till*, the United States Supreme Court was called upon to determine the method by which bankruptcy courts in Chapter 13 cases are to calculate the appropriate interest rate in order to provide secured creditors full payment of their claim when their claim is to be paid in future installments as permitted by Bankruptcy Code §1325(a)(5)(B)(ii). Payments to be made in the future require the court to "'discoun[t] ... [a] stream of deferred payments back to the[ir] present dollar value,' *Rake v. Wade*, 508 U.S. 464, 472 n.8, 124 L. Ed. 2d 424, 113 S. Ct. 2187 (1993) to ensure that a creditor received at least the value of its claim." *Till*, 541 U.S. at 474 (footnote omitted).

After considering a number of alternative methods, the Supreme Court determined the most appropriate rate to be what it characterized as the "formula approach." The formula approach begins by first determining the national prime lending rate, a rate that is based upon financial markets estimate of the amount a commercial bank should charge a credit worthy commercial customer. *Till, 541 U.S.* at 479. However, because a debtor in bankruptcy poses a greater risk of nonpayment than a solvent commercial borrower, added to the prime rate is an appropriate risk adjustment. "The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The Supreme Court considered this formula the most appropriate in the chapter 13 context because it places the evidentiary burden on creditors seeking an upward adjustment of the

rate who are more likely to have available information about the financial markets and "minimizes the need for potentially costly additional evidentiary proceedings." *Till, 541 U.S. at 479.*

Significantly, however, the Supreme Court stated, "We do not decide the proper scale for the risk adjustment, as the issue is not before us." *Till, 541 U.S.* at 480. It noted that courts considering the rate adjustment have generally approved adjustments of 1% to 3% and cited the United States Court of Appeals for the Second Circuit's panel decision in *In re Valenti*, 105 F.3d 55, 64 (2d Cir.1997) as one such court. The Supreme Court also observed, "this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an "eye-popping" interest rate, the plan probably should not be confirmed." *Till*, 541 U.S. at 480-481 (citation omitted).

The parties in this case have stipulated in court to a current prime rate of 3.25%. The Debtors have provided in their Plan for a risk rate adjustment upward of 2.75%. Eastern, by contrast, asks for a risk rate adjustment of 8.625% resulting in a total interest rate of 11.875% which equals the note default rate previously set in the related 1999 loan modification agreement. In *Valenti,* the Second Circuit stated in considering the appropriate rate adjustment that "[t]he actual rate will depend upon the circumstances of the debtor, including prior credit history as well as the viability of the reorganization plan. We hold that a range of one to three percent is reasonable in this circuit but leave it to the bankruptcy court in the first instance to make a specific determination." 105 F.3d at 64. Thus, the burden is on Eastern to justify an interest rate adjustment higher than the 3%

6

range. Eastern has not met that burden.

It is also worth noting that in *Valenti*, the property in question was an automobile rather than real estate. While it is certainly possible that the Property (the Debtor's home) could depreciate in value over the five year period designated for Plan repayment, it is clearly distinguishable from an automobile which routinely and significantly depreciates in value as it ages, and being "mobile" is at greater risk of damage or loss through accident or theft. Thus, consideration of the nature of the security in the present case supports the fixing of a risk adjustment at a rate no higher than the rate range suggested by *Valenti*.

Eastern argues that because the amount of their debt exceeds the Property's value by about $39,000, the risk of default is greater, presumably because a reasonable person against whom a secured creditor has no recourse because of the bankruptcy, would not choose to pay back a secured obligation that exceeds to the degree it does here the value of property. While it may be correct that ordinarily a reasonable person would not seek to retain property under such circumstances, that factor does not raise the risk to the creditor, in fact, it lowers it. If Eastern were permitted to foreclose on the Property, at best, it could only hope to sell the Property to a new buyer for its current value of $152,000.00. Under the Plan, Eastern enjoys the real potential for a windfall of $38,825.06, plus, whatever interest is added to account for the deferred payments over the five year term of the Plan.

Eastern has also failed to consider that the Debtors were required to commence plan payments within 30 days of the petition date. Bankruptcy Code §1326(a)(1). Taking

into account the December 29, 2010 petition date in this case, the Plan payment amount, and noting the absence of a motion to dismiss filed by the Chapter 13 Trustee, it may be assumed that the Chapter 13 trustee is now holding approximately $29,000.00. Upon Plan confirmation and following full payments to priority creditors, attorney and trustee fees, Eastern should receive an immediate distribution of approximately $14,000.00. Subsequent Plan payments, in a matter of months, will wipe out the amount by which Eastern's debt exceeds the value of the Property, and restore to the Debtors equity. To the extent the Debtors were to default in their post-confirmation Plan payments and Eastern is allowed to proceed with a foreclosure of the Property, it will be in a far better financial position than it is now if Plan confirmation is denied. *See* §1326(a)(2). ("If a plan is not confirmed, the trustee shall return any such payments not previously paid . . . to the debtor, after deducting any unpaid claim allowed under section 503(b)").

Eastern also argues that considering the Debtors' previous bankruptcy history, the past forbearance agreement and prior foreclosure action and a present loan to value ratio of 125%, the Debtors would not be able to obtain any sort of loan in the marketplace. Their witness, Andrew Trainer, also testified as to the negative impact approval of the proposed interest rate would have on the bank's finances. However, in *Till, 541 U.S. at 479,* the Supreme Court specifically stated that the creditor's circumstances would not be a consideration. ("[T]he resulting "prime-plus" rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor").

Therefore, taking into account the factors dictated by *Till* and *Valenti*, and only

8

having been given the choice of two alternative rates, this Court determines that the appropriate size of the risk adjustment to be added to the stipulated prime rate in this case is that proposed in the Plan – the blended Plan rate of 6% (3.25% prime plus a 2.75% upward risk adjustment = 6%).

### *B. Feasibility*

Having established the appropriate Plan rate, the matter of Plan feasibility can be more clearly evaluated. The Debtors' schedules show a monthly net income of $7,021.39. With proposed monthly payments of $4,502.38, they are left with a comfortable cushion of $2,519.01. While Eastern has raised concern over the fact that Mr. Marrero was out of work ill for a considerable period of time and has only been working with his present employer for a few months, Eastern has presented no actual evidence indicating that Mr. Marrero may be forced to leave this job because of illness or for other reasons. Such suggestions are mere speculation. Further, Mrs. Marrero has been employed as a nurse at Bristol Hospital for more than 23 years.

Eastern's suggestion that the Debtor's prior bankruptcy increases the risk of this Plan's failure has no merit. In the prior bankruptcy, the Debtors successfully completed their plan, having made all of their required plan payments, including those owed to Eastern, and received their discharge. In light of the Debtors' substantial and regular income leaving them with a comfortable cushion after deducting proposed Plan payments, this Court is fully satisfied that the Plan as proposed is feasible, the likelihood of default thereunder is low, and that the Debtors will be able to make all payments under the Plan

and comply with the Plan.

## V. CONCLUSION AND ORDER

In accordance with the above discussion,

**IT IS HEREBY ORDERED** that Eastern Savings Bank FSB's *Amended Objection to Plan Confirmation,* ECF No. 23, is **OVERRULED**, and

**IT IS FURTHER ORDERED** that the hearing to consider confirmation of the Debtors' Second Amended Chapter 13 Plan shall be held on the previously scheduled hearing date of October 13, 2011.

Dated: September 20, 2011                                                        BY THE COURT

Albert S. Dabrowski
United States Bankruptcy Judge